**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 13-cv-61358—ROSENBAUM/HUNT**

INTELLECTUAL VENTURES I, LLC, *et al.*

Plaintiffs,

vs.

MOTOROLA MOBILITY LLC,

Defendant.
____________________________________________/

# PLAINTIFFS INTELLECTUAL VENTURES I LLC AND INTELLECTUAL VENTURES II LLC'S OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

**I. LAW OF CLAIM CONSTRUCTION ........ 1**

**II. U.S. PATENT NO. 6,121,960 ........ 2**

A. "pixel" ........ 2

**III. U.S. PATENT NO. 7,848,353 ........ 4**

A. "recovering the indication" ........ 4

B. "bandwidth" ........ 7

C. "a signal having a first signal portion" ........ 9

D. "a further signal portion" ........ 12

**IV. U.S. PATENT NO. 6,170,073 ........ 13**

A. "error detection decoding means for generating an error signal corresponding to the respective first and second digital signal classes" ........ 13

B. "error detection code" ........ 16

**V. U.S. PATENT NO. 7,382,771 ........ 17**

A. "without the need to access an external service controller server" ........ 17

B. "local content module" ........ 20

**VI. U.S. PATENT NO. 5,790,793 ........ 22**

A. "reference to a predetermined location" ........ 22

**VII. CONCLUSION ........ 24**

# TABLE OF AUTHORITIES

**Cases**

**Page**

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*,
616 F.3d 1283 (Fed. Cir. 2010)........................................................................ 12

*Al-Site Corp. v. VSI Int'l, Inc.*,
174 F.3d 1308 (Fed. Cir. 1999)........................................................................ 14

*Altiris, Inc. v. Symantec Corp.*,
318 F.3d 1363 (Fed. Cir. 2003)........................................................................ 14

*Biagro Western Sales, Inc. v. Grow More, Inc.*,
423 F.3d 1296 (Fed. Cir. 2005).......................................................................... 1

*Cephalon, Inc. v. Watson Pharm., Inc.*,
707 F.3d 1330 (Fed. Cir. 2013).......................................................................... 6

*Elcommerce.com, Inc. v. SAP AG*,
2014 WL 685622 (Fed. Cir. Feb. 24, 2014) ..................................................... 9, 15, 16

*Exxon Research & Eng'g Co. v. United States*,
265 F.3d 1371 (Fed. Cir. 2001).......................................................................... 3

*Genentech, Inc. v. Novo Nordisk A/S*,
108 F.3d 1361 (Fed. Cir. 1997).......................................................................... 7

*Honeywell Int'l v. ITC*,
341 F.3d 1332 (Fed. Cir. 2003).......................................................................... 3

*Housey Pharma., Inc. v. Astrazeneca UK Ltd.*,
366 F.3d 1348 (Fed. Cir. 2004).......................................................................... 3

*Kara Tech. Inc. v. Stamps.com Inc.*,
582 F.3d 1341 (Fed. Cir. 2009)................................................................... 22, 24
*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004)............................ 12

*Markman v. Westview Instruments, Inc.*,
52 F.3d 867 (Fed. Cir. 1995)............................................................................. 1

*Netcraft Corp. v. eBay, Inc.*,
549 F.3d 1394 (Fed. Cir. 2008).......................................................................... 1

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2001)........................................................................ 14, 16

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)........................................................................... 1, 2

*Seachange Int'l, Inc. v. C-COR Inc.*,
413 F.3d 1361 (Fed. Cir. 2005)............................................................................. 12

*Tessenderlo Kerley, Inc. v. Or-Cal, Inc.*, No. 11-04100, 2012 WL 2054994 (N.D. Cal.
June 5, 2012)............................................................................................................ 7

*Thorner v. Sony Entertainment America, LLC.*,
669 F.3d 1362 (Fed. Cir. 2012)......................................................................... 3, 24

**Statutes**

35 U.S.C. § 112(f)................................................................................................. 9

This brief addresses the construction of the 10 terms identified by the parties in this matter as the most important terms. These terms related to five of the seven patents-in-suit: Intellectual Ventures' ("IV") U.S. Patent No. 6,121,960 ("the '960 patent"), U.S. Patent No. 7,848,353 ("the '353 patent"), U.S. Patent No. 6,170,073 ("the '073 patent"), U.S. Patent No. 7,382,771 ("the '771 patent"), and U.S. Patent No. 5,790,793 ("the '793 patent") (collectively the patents-in-suit). IV respectfully requests that the Court adopt its proposed constructions and reject Defendant Motorola Mobility, LLC's ("MML") proposed constructions for the reasons below.

## I. <u>LAW OF CLAIM CONSTRUCTION</u>

A patent infringement analysis requires two steps: (1) claim construction and (2) application of the properly construed claims to the accused product. *Markman v. Westview Instruments, Inc.*, 52 F.3d 867, 976 (Fed. Cir. 1995). The first step is purely a question of law, which "begins with, and remains focused on, the language of the claims." *Biagro Western Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1301-02 (Fed. Cir. 2005). Generally, claim terms should be given their ordinary and customary meaning, which is the meaning "the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).

"In addition to considering the specification, courts should consider the prosecution history of an asserted patent if it is in evidence." *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1396-97 (Fed. Cir. 2008) (citing *Phillips*, 415 F.3d at 1317). The prosecution history is also relevant to claim construction because it demonstrates how the patentee understood the invention and whether he limited its scope during prosecution. *Id.* The patent and the prosecution history before the United States Patent and Trademark Office constitute intrinsic evidence for purposes

of claim construction. *Phillips*, 415 F.3d at 1317. Extrinsic evidence also may play a role in the interpretation of claim language, though its significance is less than the intrinsic record. *Phillips*, 415 F.3d at 1317. Extrinsic evidence may include "expert and inventor testimony, dictionaries.

## II. U.S. PATENT NO. 6,121,960

### A. "pixel"

| IV's Construction | MML's Construction |
|---|---|
| Plain and ordinary meaning | Indefinite, cannot be construed |

A pixel is one of the most common, well-understood terms in computer science. It is so readily known that even those with a moderate appreciation of computer technology understand it. The term is an abbreviation of the phrase "picture element" and means a basic unit of a computer display or computer image. The '960 patent inventors did not attempt to redefine that meaning. They used pixel consistently throughout the '960 patent, in the specifications and the claims, to mean an element of a picture or image that is displayed. Ex. 1, '960 patent, Figs. 3-5, 2:8-15, 4:33-38, 7:57-63 (showing graphical images and displays and discussing pixels as elements of such images and displays). This also comports with the relevant extrinsic evidence, which is nearly uniform in the definition of "pixel."

- "The abbreviation of PICTURE ELEMENT, a dot on a display screen used in creating graphic images…." Ex 2, 1994 21st Century Dictionary of Computer Terms, p. 269.
- "Picture element." Ex. 3, 1994 IBM Dictionary of Computing, p. 512.
- "Any of the dots that make up an image…" Ex. 4, 1995 Websters New World Dictionary, p. 449.
- "Picture element." Ex. 5, 1996 PC Hardware and Data Communications Terms, p. 347.
- "Acronyms for picture element." Ex. 6, 1995 Dictionary of Computer Words, p 216-217.
- "one of the individual dots that makes up a graphical image." Ex. 20, 1995 Dictionary of

Computer Terms, 251.

This is also how MML has used the term pixel in over 170 patents that include "pixel" in the claim language. Ex. 7 (listing the patents assigned to MML (or related or predecessor entity) that use the word pixel).

A claim term is presumed to have its plain and ordinary meaning. *Housey Pharma., Inc. v. Astrazeneca UK Ltd.*, 366 F.3d 1348, 1352 (Fed. Cir. 2004). ("When construing patent claims, there is a heavy presumption that the language in the claim carries its ordinary and customary meaning."); *Thorner v. Sony Entertainment America, LLC.*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history."). The inventors did nothing to deviate from that presumption. *See Thorner*, 669 F.3d at 1365-66 ("There only two exceptions to [the plain meaning] rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution.").

Yet MML has taken the position that this straightforward, well-understood term cannot be construed and is indefinite. "[A] claim is indefinite only if the 'claim is insolubly ambiguous and no narrowing construction can properly be adopted.'" *Honeywell Int'l v. ITC*, 341 F.3d 1332, 1338-39 (Fed. Cir. 2003). In other words, a claim is sufficiently definite if "one skilled in the art would understand the bounds of the claim when read in light of the specification." *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001) ("If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds.").

One skilled in the art can certainly understand the meaning of "pixel" as shown above. Despite being the burden of persuasion, MML has proffered no expert analysis—or evidence of any kind—to suggest one of skill in the art could not understand this term. Thus, IV requests the Court construe the term in accordance with its plain and ordinary meaning.

## III. U.S. PATENT NO. 7,848,353

### A. "recovering the indication"[1]

| IV's Construction | MML's Construction |
| --- | --- |
| Recovering a value corresponding to he operating bandwidth at which the remote unit will be configured to communicate with a base station | This term is not enabled by the specification |

IV's construction is consistent with the plain language of the claim, the patent specification, and file history. MML's request that the Court invalidate the claims for lack of enablement—without any discovery or expert testimony—is both baseless and premature. Therefore, IV's construction should be adopted.

The '353 patent teaches a way to synchronize a remote unit, such as a cell phone, with a base station, so that the remote unit and base transceiver station (sometimes referred to as a "base station" or "Node B") can communicate using the same operating bandwidth. Ex. 8, '353 patent at 1:13-17, 3:25-40, Abstract, Figure 1. Figure 1 (below) depicts a wireless communication system in which the invention is designed to operate, including remote units (i.e., subscriber terminals 112, 114, 116) that communicate with base transceiver stations 122, 124, 126, 128, 130, 132 over radio links 118, 119, 120. *Id.* at col. 3:8-10, 25-40, Fig. 1.

[1] The parties incorrectly worded the limitation in the Joint Claim Construction Statement as "recovering an indication." The proper term is "recovering ***the*** indication."

Claim 1 of the '353 patent is reproduced below. The term at issue shown in bold italics and letters [a], [b] and [c] have been added to the steps of the claim for ease of reference:

> 1. A method for operating bandwidth determination in a multi-bandwidth communication system, the method comprising:
> at a remote unit:
> [a] receiving a signal having a first signal portion at a first, predetermined bandwidth, containing an indication of an operating bandwidth selected from a plurality of bandwidths used for a further signal portion;
> [b] ***recovering the indication*** from the first signal portion at the first, predetermined bandwidth; and
> [c] recovering information in the further signal portion at the operating bandwidth indicated by the indication.




FIG. 1

In particular, "the indication" recovered in step [b] is an indication of the "an operating bandwidth" at which the remote unit will be configured (in step [c]) to recover further information from the base station. Therefore, the language of the claim supports IV's

construction, *i.e.*, a value corresponding to the operating bandwidth at which the remote unit will be configured to communicate with a base station.

The patent specification also supports IV's construction. Figures 4B and 4C depict a remote unit receiver ("receiving UE") that communicates with a base station ("Node B") shown in Figure 4A. *Id.* at col. 7:24-8:11, Figs. 4A-C. The patent explains how the remote unit recovers the indication of operating bandwidth for the disclosed embodiment. *Id.* at col. 7:40-64. The patent further explains that the indication recovered provides a value ("decoded from SCH information") at which the remote unit ("receiving UE") will be configured in Figure 4C to communicate with the base station ("Node B"). *Id.* at 7:56-64. This is consistent with IV's construction.

MML's position that this claim term in not enabled is premature and baseless. First, this argument is being made at the claim construction stage and before the close of expert discovery. An enablement inquiry necessarily depends on an interpretation of the claims. Second, even if the argument were appropriate now, MML has offered no expert analysis or evidence of any kind to support its argument. MML bears the burden to show lack of enablement by "clear and convincing evidence" that a "person of ordinary skill in the art, having read the specification" could not practice the invention "without undue experimentation." *Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013). This analysis is factually intensive. "Whether undue experimentation is required is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations." *Id.* (internal quotation omitted). Because of this, enablement, which requires that a person skilled in the art be able to make the claimed invention without undue experimentation, "nearly always requires expert analysis because it requires an assessment from the perspective of a person of ordinary skill in

the art."[2] *Tessenderlo Kerley, Inc. v. Or-Cal, Inc.*, No. 11-04100, 2012 WL 2054994, at *5 (N.D. Cal. June 5, 2012); *see also Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1367 (Fed. Cir. 1997) ("[A]n expert's opinion on the ultimate legal issue [of enablement] must be supported by something more than a conclusory statement."). MML has none. On this basis alone, MML's request for summary judgment on this issue fails. Moreover, the patent provides detailed steps explaining how the remote unit recovers the indication of operating bandwidth for the disclosed embodiment this term would be sufficiently enabled for a person of ordinary skill in the art. *Id.* at col. 7:40-64. Therefore, even if MML had provided some scintilla of evidence in support of its position—which it has not—it would not trump the clear and unambiguous disclosure of the patent.

For these reasons, IV's construction should be adopted.

### B. "bandwidth"

| IV's Construction | MML's Construction |
|---|---|
| the width of a frequency band | Indefinite, cannot be construed |

The term "bandwidth" is a common, well-understood word in the field of wireless communications that means the "width of a frequency band" (IV's construction). The patent specification, file history, and claims support this simple definition, as do various technical dictionaries and treatises.[3]

---

[2] In the context of the '353 patent, a person of ordinary skill in the art is someone who would have earned a Bachelors Degree in Electrical Engineering or a related field in combination with 2-3 years of experience in the wireless communications field, or would have equivalent educational or work experience.

[3] *See e.g.* Ex. 9, Focal Illustrated Dictionary of Telecommunications (1999)("bandwidth: The bandwidth of a device is usually a measure of the *frequency range* or *frequency band* over which it meets its operating characteristics. Therefore the bandwidth of a *transmission medium* is the

At the very outset, the ’353 patent describes the synchronization procedures addressed by the patent are to allow remote units to “align the remote ***frequency reference***” to that used by the infrastructure or base station. Ex. 8, ’353 patent, col. 1:23-29 (emphasis added).[4] Thus, operating “bandwidth” recited in the ’353 patent claims is the width of a *frequency band* the remote unit’s receiver uses to communicate with a base station, consistent with IV’s construction.

The ’353 patent also incorporates by reference a related British patent application by the same inventor, Paul Howard, which describes bandwidth in the same way—i.e., the width of a band of frequencies. *See id*. at 6:58-64; Ex. 12 GB Patent App. “DIGITAL FILTER FOR MULTI-RATE COMMUNICATION,” filed July 30, 2001 at p. 3 (“A designer of communication equipment, that is capable of being used in such a ***variable—bandwidth*** communication system, must consider the requirement for the circuits and circuit elements to be able to operate across a ***wide frequency range*** as well as cope with more than one signal ***bandwidth***.”) (emphasis added). Like the system described in the British patent application, the claims of the ’353 expressly relate to “multi-bandwidth” communication systems implemented over different frequency bandwidths. *See e.g.*, Ex. 8, ’353 patent at claim 1 (“A method for operating bandwidth determination in a multi-bandwidth communication system….”). Therefore, the patent claims themselves also support IV’s construction.

Instead of providing a construction, Motorola claims that the word “bandwidth” is

---

band of frequencies which it can carry without significant loss or *distortion.*”) (italics in original); Ex. 10, Newton’s Telecom Dictionary 9th Ed. (1995)(“Bandwidth: 1. A range of electrical frequencies a device can handle….”).

[4] During prosecution of the ’353 patent, the patentee referred to this very same description in reference to remote unit of pending claim 34, which became claim 1 of the patent. *See* Ex. 11, ’353 Patent File History, Amendment of June 2, 2010, at page 10-11.

insolubly ambiguous and asks the Court to invalidate all the claims of the ’353 patent on this bases. Because Motorola has failed to provide any contention or expert opinion in support of its position, IV is left to speculate as to why it contends this simple, common telecommunications term is somehow indefinite. Motorola’s feigned ignorance of the meaning of “bandwidth” is especially puzzling because Motorola itself has repeatedly used this term in the claims of its own patents to mean the exact same thing—a width of a band of frequencies.[5] Regardless of any purported bases Motorola’s attorneys may raise in its brief, it will be unable to meet the exacting standard required to invalidate the claims by clear and convincing evidence. *Elcommerce.com, Inc. v. SAP AG*, No. 2011-1369, 2014 WL 685622 (Fed. Cir. Feb. 24, 2014) at **10-15 (“The burden was on SAP to prove its case, and in the absence of evidence provided by technical experts who meet the *Daubert* criteria there is a failure of proof. Attorney argument is not evidence.”).

For all of these reasons, the term “bandwidth” is not indefinite and should be interpreted to be the width of a band of frequencies.

### C. “a signal having a first signal portion”

| IV’s Construction | MML’s Construction |
|---|---|
| a signal transmitted from a base station to the remote unit having a first portion | a contiguous signal that includes a first portion and a second portion; the first portion precedes an is at a lower bandwidth than the second portion |

The primary issue between the parties construction is whether the phrase “a signal having

[5] *See*, *e.g.*, Ex. 13, US Pat. No. 5,392,044 at claim 1 (“1. A digitizer for digitizing a ***wide frequency bandwidth*** signal…”)(emphasis added); Ex. 14, US Pat. No. 7,945,004 at claim 4 (“4. The method of claim 3, wherein the ***frequency domain*** signature comprises: at least an occupied ***bandwidth*** or an operating band.”)(emphasis added).
.

a first signal portion" is a signal transmitted from a base station to the remote unit having a first portion (IV's construction) or if MML should be allowed to inject irrelevant or unnecessary additional limitations into the phrase including that the signal must be "contiguous" and that the "first portion" is at "a lower bandwidth" than the second portion. IV's construction should be adopted because it is consistent with the specification and file history and there is no basis to import the additional limitations Motorola proposes.

The specification explains that the invention is adapted for use with a conventional wireless communication system including remote units and base stations ("infrastructure equipment"):

> It is known that synchronisation is an essential procedure in a modern digital communication system. It is the procedure used by a remote unit (often referred to as User Equipment, UB, in UMTS or Customer Premises Equipment, CPE) to identify valid transmissions from infrastructure equipment (often referred to as Node Bs in UMTS) and align the remote frequency reference and timing to that used by the infrastructure.
> …
> A plurality of subscriber terminals (or user equipment (UE) in UMTS nomenclature) 112, 114, 116 communicate over radio links 118, 119, 120 with a plurality of base transceiver stations, referred to under UMTS terminology as Node-Bs, 122, 124, 126, 128, 130, 132. The system comprises many other UEs and Node Bs, which for clarity purposes are not shown.

Ex. 8, '353 patent, col. 1:22-50, Figure 1. During prosecution of the '353 patent, the patentee referred to this example of a remote unit ("user equipment") talking to a base station ("infrastructure equipment") to argue that pending claim 34, which became claim 1 of the patent, presented allowable subject matter under 35 USC 101.

> We have amended Claim 34 to specify that the recited steps are carried out by a "remote unit." At paragraph 0002 of our specification (shown at the right) we explain that a
>
> It is known that synchronisation is an essential procedure in a modern digital communication system. It is the procedure used by a remote unit (often referred to as User Equipment, UB, in UMTS or Customer Premises Equipment, CPE) to identify valid transmissions from infrastructure equipment (often referred to as Node Bs in UMTS) and align the remote frequency reference and timing to that used by the infrastructure.

> "remote unit" is a component in a modern digital communication system and provide a number of specific examples – "User Equipment" Universal Mobile Telecommunications System (UMTS) as well as "Customer Premises Equipment (CPE)." We then explain throughout the specification that such components serve to carry out the described steps of receiving. As but one of many examples in such regards, please see paragraph 0053 (reproduced above at the right).
>
> In the preferred embodiment of the invention, at least one UE **312-316** and at least one Node-B **322-332** have been adapted, to offer, and provide for, transmission, reception and processing of multi-rate high-speed signals generated in accordance with the approach discussed in detail below.
>
> By specifying in claim 34 that the steps are carried out by a "remote unit," we have made it clear that the recited steps are unambiguously tied to an apparatus. As "remote unit" is well supported in the specification, this amendment does not introduce new matter.
>
> Similarly, we have amended independent claim 41 to specify that those transmission steps are carried out by "infrastructure equipment." The above-quoted paragraphs from our specification make clear that such infrastructure equipment (such as Node-B's) carry out these transmission steps. Accordingly, by specifying in claim 41 that the steps are carried out by "infrastructure equipment," we have made it clear that the recited steps are unambiguously tied to an apparatus. As "infrastructure equipment" is well supported in the specification, this amendment does not introduce new matter.

Ex. 11, '353 Patent File History, Amendment of June 2, 2010 at page 10-11. Therefore, the "signal having a first portion" of claim 1 is a signal transmitted from a base station to the remote unit having a first portion.

In contrast to IV's construction that is rooted in the patent specification and file history, Motorola's construction injects limitations that have no intrinsic evidentiary basis and, in fact, contradict the teachings of the '353 patent. Motorola's proposed requirement that the signal be "contiguous" would read out the preferred embodiment of the invention. The specification repeatedly teaches that the base station signal and its components are bursty—not contiguous. *See e.g.,* Ex. 8, '353 patent col. 6:28-30 ("The data burst containing the SCH information…"), col. 6:35-39 ("…performs the initial filtering of the data burst received at the antenna."). The specification also teaches that in the preferred embodiment, the base station signal includes

signal portions that exist on different communication channels, including a synchronization channel (SCH) and separate channels used to transport data. Because in the preferred embodiment, the base station signal is described as bursty and existing over different communication channels, Motorola's requirement that the signal be "contiguous" would improperly read out the preferred embodiment. *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010).[6]

Motorola's construction also contradicts the plain language of the claim. First, requiring the signal to be "contiguous" would render claim 5 meaningless, as it requires the signal to include a "data burst." Second, requiring the first portion to be at a lower bandwidth than the second portion violates the principle of claim differentiation because dependent claim 4 adds the additional limitation that the "first, predetermined bandwidth is lower than the indicated operating bandwidth." This doctrine stems from "the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1368-1369 (Fed. Cir. 2005). The doctrine is at its strongest "where the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004).

For all these reasons, IV's construction should be adopted.

**D. "a further signal portion"**

| IV's Construction | MML's Construction |
|---|---|
| A second portion of the signal transmitted from a base station to the remote unit | the second portion of the contiguous signal; the second portion follows and is at a higher |

[6] "A claim construction that excludes the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support."

| | |
|---|---|
| | bandwidth than the first portion |

The primary issues of dispute are the same for this term as for "a signal having a first signal portion." A further signal portion should be interpreted to be "a second portion of the signal transmitted from a base station to the remote unit" because it is consistent with the specification, claims and file history for all the same reasons discussed above, which are incorporated here by reference.

## IV. U.S. PATENT NO. 6,170,073

### A. "error detection decoding means for generating an error signal corresponding to the respective first and second digital signal classes"

| IV's Construction | MML's Construction |
|---|---|
| Function: generating an error signal corresponding to respective first and second digital signal classes<br><br>Structure: Element 604, 804 of Figures 7 and 8 respectively, and equivalents thereof | Indefinite for lack of structure. Any construction of this element should make it clear that there are two error signals: a first error signal corresponding to the first class and a second error signal corresponding to the second class |

IV's construction is supported by the '073 patent's specification, while MML's construction is flatly contradicted by very recent Federal Circuit law as well as the specification.

Some claim terms are drafted in "means-plus-function" form in which a portion of the text of a patent claim is recited "as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof." 35 U.S.C. § 112(f). When a claim term uses the word "means," it raises a rebuttable presumption that the limitation is a means-means-plus-function limitation under section 112(f). *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003). IV and MML agree that this is a means-plus-function term and subject to the requirements section 112(f).

Once a claim limitation is determined to be a means-plus-function limitation subject to section 112(f), the next step is to identify the term's function and identify the corresponding structure. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2001). Here, the function is readily apparent from the plain language of the term – "generating an error signal corresponding to the respective first and second digital signal classes." MML does not appear to dispute this either.

Thus, the only dispute is what the specification calls out as the corresponding structure. IV's construction – element 604, 804 of Figures 7 and 8 respectively, and equivalents thereof[7] – is a recitation of the structure identified by the '073 patent's specification as corresponding to the error detection decoding means. Ex. 15, '073 patent, Figs. 7 and 8.

The specification is clear as to what the error detection decoding means is, what it does and how it works. First, the specification states that element 604 of Figure 7 represents the error detection decoder that generates the claimed signal and how it acts to generate the claimed signal. Ex. 15, '073 patent at 9:37-51.[8] Likewise, element 804 of Figure 8 represents the error detection decoder, and the specification explains how this structure generates the claimed signal. *Id.* at 12:49-13:12.[9] The specification confirms this throughout and clearly links this structure to the claimed function. *See*, *e.g.*, *id.* at 8:9-19. Thus, the Court should adopt IV's construction.

---

[7] "Thus, § 112, ¶ 6 procedures restrict a functional claim element's broad literal language ... to those means that are 'equivalent' to the actual means shown in the patent specification…Thus, an equivalent under § 112, ¶ 6 informs the claim meaning for a literal infringement analysis" *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1320 (Fed. Cir. 1999) (internal quotations omitted).

[8] "The cyclic redundancy check CRCSl1 … CRC-sin are input to error detection decoder 604 where it is determined if an error has occurred in respective importance classes. Error results QCRCSl1 … QCRCsln are out from respective importance classes."

[9] "Thus, each of the cyclic redundancy checks CRCsl1—CRCsin correspondingly contain information about the more important classes. This information is processed by error detector 804 and the qualify results QCRCsl1=QCRCsln forwarded to the equality estimation circuitry 806, where respective weightings ki are applied to the quality results, and a value B estimated."

MML's indefiniteness argument, on the other hand, should summarily be rejected under the recent Federal Circuit decision in *Elcommerce.com, Inc. v. SAP AG*, 2014 WL 685622 (Fed. Cir. Feb. 24, 2014). There the Federal Circuit was clear that it is error – except in very rare circumstances not present here – to find a means-plus-function claim limitation indefinite for lacking a corresponding claim structure without evidence from a qualified expert, as opposed to attorney argument. *Id.* at **10-15 ("The burden was on SAP to prove its case, and in the absence of evidence provided by technical experts who meet the *Daubert* criteria there is a failure of proof. Attorney argument is not evidence."). Here, the deadline for claim construction discovery has passed, and MML has not provided any evidence that this claim term is indefinite, much less clear and convincing evidence of indefiniteness. As can be seen from a cursory review of the '073 patent, it involves highly technical and complex subject matter related to error detection in digital communications and involves signals, encoders, decoders and codes, among other things. MML cannot say one of ordinary skill in the art would find this detailed description in the specification is not linked to the claimed structure without evidentiary support.[10]

Moreover, even assuming for purposes of argument that the '073 patent did not specifically call out a structure as the error detection decoding means (it does) it is perfectly acceptable "and, in fact preferable" to use "functional-type block diagrams" (like those in Figures 7 and 8 of the '073 patent) to "serve in conjunction with the reset of the specification" to identify the claimed structure. *Elcommerce.com*, 2014 WL 685622, *12. MML has no basis – neither in law or in fact – to claim that this term is indefinite.

---

[10] As a fallback argument, MML states in its proposed construction that "[a]ny construction of this element should make it clear that there are two error signals." This is contradicted by the language of the claim term, which requires an "error detection decoding means for <u>generating an error signal</u>." The claim only requires the generation of a signal for the respective classes. Further, if MML is able to offer a construction, then that by itself suggests that it understands the structure of the claim, and it is not indefinite.

**B. "error detection code"**

| IV's Construction | MML's Construction |
|---|---|
| a code that allows data errors to be detected | a code that detects, but does not allow for correction |

The first dispute between the parties' constructions is that MML impermissibly seeks to narrow this simple term by taking on the negative limitation "but does not allow for correction." The addition of this negative limitation is completely untethered from the intrinsic record – neither the language, the specification, nor the prosecution history evidence contain any explicit disclaimer of claim scope that can justify MML's construction. *Omega Engineering v. Raytek Corp.*, 334 F.3d 1314, 1322-23 (Fed. Cir. 2003) (reversing the district court's addition of a negative limitation absent "any express disclaimer or independent lexicography in the written description").

There is not one word in the claims of the '073 patent that supports MML's position that the "error detection code" cannot also "allow for correction." Moreover, the specification flatly contradicts MML's negative limitation with multiple examples of embodiments where error detection codes contribute to the error correction process. *See*, *e.g.*, Ex. 15, '073 patent at 7:48-8:26; 9:23-37; 9:47-51; 10:25-62; 13:29-35; Figs. 5, 7, 9, and 10. One prime example is where the error detection code is used to calculate error results, which then permit for good frames to be used for speech synthesis, while bad frames are substituted by the extrapolating replacement frames from the prior good frames. *Id.* at 9:23-37; 9:47-51; 10:26-62; Fig. 7. Finally, there is not one part of the prosecution history that MML can point to in support of its negative limitation. The negative limitation has been made up by MML whole cloth.

The second dispute is that MML's constructions say that the code itself detects, as

opposed to the code being something that "allows data errors to be detected" (IV's construction). MML's construction is contrary to common sense. A code is bits and bytes (ultimately interpreted as a series of 1s and 0s) and does not by itself detect errors. The error detection code is an input that allows an error detection algorithm embodied in software and hardware to detect errors in data. The specification is clear that the error detection codes allow for the detection of errors and do not themselves detect the errors: "The cyclic redundancy checks $CRC_{SI1}$ . . . $CRC_{SIN}$ are input to **error detection decoder 604 where it is determined if an error has occurred** in respective importance classes. Error results $QCRC_{SI1}$ . . . $QCRC_{SLN}$ are output from respective importance classes. Ex. 15, '073 patent at 9:47-51 (emphasis added); 12:57-65. Thus, in an examplary embodiment, it is an error detection decoder that actually detects whether an error has occurred in the data using the error detection code. The error detection code is an input that "allows" a component such as a decoder to detect errors.

The Court should reject MML's construction for these reasons. And because IV's construction sets forth the plain meaning of what an error detection code is – *i.e.*, a code that allows data errors to be detected – IV's construction should be adopted.

## V. U.S. PATENT NO. 7,382,771

### A. "without the need to access an external service controller server"

| IV's Construction | MML's Construction |
|---|---|
| without the need to access a service controller server external to the mobile hotspot and wireless network | without the need to connect to an external server before enabling client device internet access |

The issue here is what constitutes an "external service controller server." First, IV's construction recognizes that the patentees intended "external service controller server" to be a

particular type of hardware as described in the file history. Second, it recognizes that the external service controller server must be external to the *stand-alone* mobile wireless hotspot system and wireless network of claim 1. MML's construction is vague and unhelpful in understanding what an "external service controller server" is and whether it is part of the *stand-alone* hotspot system of claim 1. It has no support in the intrinsic evidence and should be rejected.

This limitation was added during prosecution to distinguish the '771 patent's stand-alone system from prior art that relied on an "external service controller server" to enable Internet access. The language added to element (c) of claim 1 is the underlined portion of the text reproduced below:

> wherein said mobile wireless hotspot system <u>is a stand-alone system that</u> enables client devices configured for short-range, high-speed wireless Internet access to use said mobile wireless hotspot system to access the Internet <u>without the need to access an external service controller server</u>.

Ex. 16, '771 Patent File History, November 30, 2007 Response to Office Action. The prior art at issue was U.S. Patent Application Publication No. 2002/0073240 ("Kokkinen"). Figure 1 showing the Kokkinen system 50 is shown below.




*Figure 1*

Kokkinen describes "a server" broadly as an off the shelf laptop PC. *See*, *e.g.*, Ex. 17, *Kokkinen* at ¶¶ 19 and 22. It was disclosed as being in a locked cabinet on a train car. *Id.* Kokkinen's server, however, is incapable of providing Internet access to cellular telephones without access to a separate "service controller server," which is an external device accessed via an "external network" or "external, public, mobile WCDMA network." *Id.* at ¶ 23. Therefore, the external service controller is external to both the hotspot system and the wireless network, i.e., mobile WCDMA network. The "service controller server" that the patentees distinguished by their amendment was a specific type of hardware that resides external to the wireless network and the mobile hotspot, as shown below. *Id.* at ¶ 24. It is this hardware that is specifically called out by the claim language of the '771 patent—not any "external server" as per MML's proposed construction. To be sure, the '771 applicants did not disclaim access to all types of servers, but only a very specific type of "service controller server" external to its mobile hotspot server 50 and the wireless networks, as seen below. The '771 applicants did not disclaim access to servers that form part of a wireless network such as a WCDMA network, a type of wide area network (WAN) described in the '771 patent. *See* Ex. 18, '771 patent at e.g. 2:42, 1:41-56, 5:52-64, Fig. 10.




Second, the service controller server is also described as "remote server" and is not on the train, unlike the server. That is what is meant by "external." Essentially, many of the hotspot components and associated functionality needed to provide "hotspot" functionality and Internet access to devices (e.g. cellular telephones 16 in Kokkinen) are in the *remote* service controller server, which is external to and not part of wireless networks 62 or 67, seen above in Fig. 2 of Kokkinen. This is unlike the '771 patent that provides Internet access *without the need* to access an external server or external components, as captured by this claim limitation.

IV's construction makes plain that an "external service controller server" is external to the *stand-alone* hotspot system and wireless network of claim 1, as required by the specification and the file history. Thus, IV requests the Court adopt its construction.

**B. "local content module"**

| IV's Construction | MML's Construction |
|---|---|
| module on the mobile wireless hotspot that can present content stored locally to a user or content based on geographic location[11] | a module capable of customizing local content to present a client device based upon location and/or client demographics |

MML's proposed construction has two flaws.

First, it excludes one of the two disclosed meanings for local content and the associated functionality of the claimed "local content module." Local content is taught by the '771 patent specification and plain language of claim 4 to mean content stored locally on the device that can be presented by the local content module. *See* Ex. 18, '771 patent, 2:33-41; 3:54-55, claim 4. Content stored locally (i.e., stored within the mobile hotspot) does not have to be content based on geography or demographics. Instead, local content is broadly defined in the patent to "include, but not be limited to, advertising, audio/video entertainment, local news and traffic data." *Id.* at 2:36-38, 4:22-24.

Second, there is nothing in the patent specification or claim language that mandates that the local content module be capable of "customizing local content to present to a device based upon location and/or client demographics." To the contrary, the Summary of the Invention states that the content stored locally "***can be*** tailored based on demographic information obtained directly or indirectly … from the user." *Id.* at 2:38-41. Claim 4 is completely silent as to the type of data the local content module should store and what, if anything, it should do with the data. The plain language of the claim is completely silent on "customization" and only requires that the local content module "stores content that can be accessed by said client devices directly through said high-speed access point." *Id.* at claim 4. MML's construction improperly takes

[11] This is not the original construction IV proposed. Rather, IV proposed this as a potential compromise construction in an attempt to narrow the differences between IV and MML with respect to this term.

optional features from the specification (e.g., "customizing content", "based upon location and/or client demographics") and imports them into the claims. On this basis alone, MML's construction should not be adopted. *See Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims."). Furthermore, MML's attempt to import "customizing of local content" into the definition of local conflict module conflicts with language claim 5, which treats "dynamic tailoring of local content" as a separate and distinct limitation from "local content module." As recited in claim 5, dynamic tailoring requires a GPS locator, which is ***not*** present in claim 4.

IV's construction should be adopted because it is consistent with specification and the stated function of the local content module in claim 4, whereas MML's construction improperly takes optional features from the specification and imports them into the claims.

## VI. U.S. PATENT NO. 5,790,793

### A. "reference to a predetermined location"

| IV's Construction | MML's Construction |
|---|---|
| reference to a particular location that is predetermined | reference within the message to a particular location other than the message sender that contains information to be retrieved |

The '793 patent is about transmitting and receiving information that includes an address to obtain further information. Ex. 19, '793 patent, title. The invention allows messages to be sent and received with Uniform Resource Locators ("URL"), also known generally as a link, such that the linked content is displayed without necessarily showing the message itself or such that the user may click on the link as part of the message. *Id.* at Abstract. The claims, therefore, have the limitation that the message includes "a reference to a predetermined location." *Id.* at

claim 1, 9:6. This is explained throughout the specification and the claims generally as the URL or linked content. No other limitations or restrictions are provided.

The patent explains the reference to a predetermined location in the Summary of the Invention:

> Accordingly, it is an object of this invention to provide a new and useful manner of encoding, transmitting, receiving, and decoding information over a network. It is a further object of this invention to provide a new, useful and efficient manner of transmitting Uniform Resource Locators (URLs) over the Internet so that the receiver of the URL can quickly and easily view the information corresponding to the URL, though the invention is not limited to the Internet as the network or medium by or through which these methods and systems are used.
>
> These and other objects of the invention are accomplished by a new computer implemented method and computer system, which transmits a document including a Uniform Resource Locator (URL) from a transmitting station to a receiving station.

Ex. 19, '793 patent, 2:66-3:20. Here, the reference to a predetermined location is expressed as a URL. The "reference" is also described generally as a URL in the preferred embodiment description. *Id.* at 4:19-25. And the specification teaches that the URL reference can be understood in a variety of ways:

> FIG. 4 illustrates a flow chart which contains the process used by the present invention. After starting, step 402 creates or reads in a document which is identified as to location by a Uniform Resource Locator (URL). The document may contain a text message and the URL, be encoded in HTML or not be encoded in HTML, contain simply the URL, and/or contain a header indicating the type of message such as a text message, HTML message, or URL message which indicates that the message contains a URL. A feature of the invention is that the data corresponding to the URL need not be encoded and transmitted. In many instances, only the URL address is encoded and transmitted.

*Id.* at Fig. 4, 5:1-18.

Yet MML proposes the term be construed as "reference within the message to a particular location other than the message sender that contains information to be retrieved." MML's construction is oddly worded and difficult to parse. It is not clear (1) what a "message sender" is or (2) whether it is intended to limit "reference" or "particular location." Nor is it clear what it

is that "contains information to be retrieved" or even what this phrase refers to. MML's construction creates ambiguity where none otherwise exists. Patent litigation is difficult enough without lawyers adding unnecessary complexities.

Much of the confusion stems from the fact that MML's construction has no basis in the intrinsic evidence. Nothing in the patent teaches, suggests, or even implies that the reference to a predetermined location must be "other than the message sender that contains information to be retrieved." MML cannot manufacture its own construction (particularly where there is no support in the record) unless the patentee acted as his own lexicographer or disavowed full claim scope, neither circumstance of which is the case. *Thorner*, 669 F.3d at 1365. Even if there were some support in the description for the preferred embodiment, which there is not, MML still cannot create a limitation contrary to the plain meaning of the claim language. *See Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims."). One of ordinary skill in the art would understand the term to be simply a "reference to a particular location that is predetermined."

## VII. CONCLUSION

For the reasons expressed above, IV respectfully requests the Court to adopt its proposed claim constructions for these terms.

Date: March 7, 2014

Respectfully submitted,

s/ Lance A. Harke
Lance A. Harke, P.A.
Florida Bar No. 863599
lharke@harkeclasby.com
Sarah Clasby Engel, P.A.
Florida Bar No. 991030
sengel@harkeclasby.com
Howard M. Bushman, P.A.
Florida Bar No. 0364230
hbushman@harkeclasby.com
**HARKE CLASBY & BUSHMAN LLP**
9699 NE Second Avenue
Miami Shores, FL 33138
Telephone: (305) 536-8220
Facsimile: (305) 536-8229

OF COUNSEL:

Elizabeth Day, Esq. (*pro hac vice*)
eday@feinday.com
Marc Belloli, Esq. (*pro hac vice*)
mbelloli@feinday.com
**FEINBERG DAY ALBERTI & THOMPSON LLP**
1600 El Camino Real, Suite 280
Menlo Park, CA 94025
Telephone: 650-618-4360
Facsimile: 650-618-4368
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served by the Clerk by using the CM/ECF system on this 7th day of March, 2014, on all counsel or parties of record on the Service List

s/ Lance A. Harke

**SERVICE LIST**

Edward M. Mullins
emullins@astidavis.com
Regan N. Kruse
rkruse@astidavis.com
**ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.**
701 Brickell Avenue, 16th Floor
Miami, Florida 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202

Christopher Schenck
cschenck@kilpatricktownsend.com
**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 Fifth Avenue, Suite 4400
Seattle, Washington 98101
Telephone: (206) 467-9600
Facsimile: (206) 623-6793

Mitchell G. Stockwell
mstockwell@kilpatricktownsend.com
William H. Boice
bboice@kilpatricktownsend.com
**KILPATRICK TOWNSEND & STOCKTON LLP**
1100 Peachtree Street, NE
Suite 2800
Atlanta, GA 30309-4528
Telephone: 404-815-6214

Steven D. Moore
smoore@kilpatricktownsend.com
**KILPATRICK TOWNSEND & STOCKTON LLP**
Two Embarcadero, Eight Floor
San Francisco, CA 94111
Telephone: 415-273-4741

Taylor Ludlam
taludlam@kilpatricktownsend.com
**KILPATRICK TOWNSEND & STOCKTON LLP**
4208 Six Forks Road, Suite 1400
Raleigh, NC 27609
Telephone: 919-420-1705

Theodore G. Brown , III
tbrown@kilpatricktownsend.com
**KILPATRICK TOWNSEND & STOCKTON LLP**
1080 Marsh Toad
Menlo Park, CA 94025
Telephone: 650-324-6353