**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 0:13-CV-61358-RSR**

INTELLECTUAL VENTURES I LLC and
INTELLECTUAL VENTURES II LLC,

        Plaintiffs,

   v.

MOTOROLA MOBILITY LLC,

        Defendant.

**DEFENDANT MOTOROLA MOBILITY LLC'S**
**<u>RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

## <u>TABLE OF CONTENTS</u>

A.  U.S. PATENT NO. 6,170,073 ("THE '073 PATENT")............................................................1

    1.      "error detection code" ........................................................................1

    2.      "error detection decoding means for generating an error signal" ...........................4

B.  U.S. PATENT NO. 6,121,960 ("THE '960 PATENT")............................................................7

    1.      "pixel" ..........................................................................8

C.  U.S. PATENT NO. 7,382,771 ("THE '771 PATENT").........................................................10

    1.      "without the need to access an external service controller server".......................11

    2.      "local content module" .................................................................14

D.  U.S. PATENT NO. 7,848,353 ("THE '353 PATENT").........................................................16

    1.      "bandwidth" ................................................................................16

    2.      "signal portion" terms ...................................................................19

           a.     The "First Signal Portion" and the "Further Signal Portion" are in the Same, Contiguous Signal ..............................................................19

           b.     The "First Signal Portion" Precedes and is at a Lower Bandwidth than the "Further Signal Portion." .........................................................21

    3.      "recovering the indication" .............................................................22

E.  U.S. PATENT NO. 5,790,793 ("THE '793 PATENT").........................................................23

    1.      "reference to a predetermined location" ................................................23

F.  CONCLUSION...............................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*All Dental Prodx, LLC v. Advantage Dental Prods.*, 309 F.3d 774 (Fed. Cir. 2002)..................... 9

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328 (Fed. Cir. 2008) ................ 5

*Biomedino, LLC v. Waters Technologies Corp.*, 490 F.3d 946, 83 U.S.P.Q.2d 1118 (Fed. Cir. 2007) ........................................................................................................................................ 6

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374 (Fed. Cir. 2006) .................. 16

*Default Proof Credit Card Systems, Inc. v. Home Depot U.S.A., Inc.*, 389 F. Supp. 2d 1325, (S.D. Fla. 2004), aff'd, 412 F.3d 1291 (Fed. Cir. 2005)............................................................. 6, 10

*Elcommerce.com, Inc. v. SAP AG*, ___ F.3d ___, 2014 WL 685622 (Fed. Cir. Feb. 24, 2014)..... 6

*ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509 (Fed. Cir. 2012) ........................................... 6

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332 (Fed. Cir. 2003) ............................ 8

*Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363 (Fed. Cir. 2009)..................... 15, 25

*Morton Int'l v. Cardinal Chem. Co.*, 5 F.3d 1464 (Fed. Cir. 1993) .................................. 8, 17, 18

*Netcraf Corp. v. eBay, Inc.*, 549 F.3d 1394 (Fed. Cir. 2008) ..................................................... 22

*O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008) .............. 24

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) ............................................. 14

*Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459 (Fed. Cir. 1998) ........................... 9

*Regents of the Uni. of California v. DakoCytomation California, Inc.*, 517 F.3d 1364 (Fed. Cir. 2008) ...................................................................................................................................... 22

*Seachange Int'l, Inc. v. C-COR Inc,* 413 F.3d 1361 (Fed. Cir. 2005) ................................... 21, 22

*SkinMedica, Inc. v. Histogen, Inc.*, 727 F.3d 1187 (Fed. Cir. 2013) ......................................... 12

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363 (Fed. Cir. 2013)............... 10, 18

*Thorner v. Sony Entertainment America, LLC*, 669 F.3d 1362 (Fed. Cir. 2012) ........................ 23

*Voter Verified, Inc. v. Election Sys. & Software, Inc.*, 745 F. Supp. 2d 1237 (M.D. Fla. 2010) .... 5

Plaintiff Intellectual Ventures ("IV") filed this suit against Defendant Motorola Mobility LLC ("Motorola") alleging infringement of seven different patents involving seven different technologies, generally related to telecommunications and networking. The parties have identified their top ten terms for claim construction, which come from five of those seven patents, and will soon be briefing an additional eleven claim construction terms.

In general, IV proposes constructions that ignore the plain language of the claims and specifications and prosecution histories of the five patents addressed herein, and that also fail to give any meaning to several terms that are indefinite as a matter of law. The constructions Motorola proposes, on the other hand, are tethered to the claims and disclosures of the patents and their prosecution histories. Further, several of the terms at issue are indefinite because a person of ordinary skill in the art would find them insolubly ambiguous.

## A.   U.S. PATENT NO. 6,170,073 ("THE '073 PATENT")

As described in the '073 patent, during a digital cellphone conversation, speech data is transmitted in small chunks called "frames." '073 patent at 1:18-27. As frames are transmitted from one phone to another, some of the speech data is lost or corrupted, resulting in errors. *Id.* at 1:28-47. A frame that has a lot of errors is called a "bad frame." *Id.* at 1:41-43. To deal with errors and bad frames, several techniques have evolved. Some of those techniques involve correcting the errors in the bad frame, while other techniques merely replace the bad frame without attempting to correct the errors. *Id.* at 1:28-47. The claims of the '073 patent relate generally to a technique for detecting errors in bad frames. '073 patent at Abstract.

### 1.   "error detection code"

This phrase appears in all of the asserted independent claims (claims 1, 18, and 35).

1

| Term | Motorola's Proposed Construction (modified)[1] | IV's Proposed Construction |
|------|------|------|
| error detection code | a code that allows data errors to be detected, but does not allow for the correction of those detected errors | a code that allows data errors to be detected |

The dispute between the parties is whether an "error *detection* code" allows errors to be detected (as Motorola proposes), or allows errors to be both detected and corrected (as IV proposes). IV would have the Court improperly expand the scope of its claims by allowing an "error detection code" to also serve as an "error correction code."

The '073 patent's specification recognizes that two *different* types of codes are used to ensure that speech data is accurate: error *detection* codes and error *correction* codes. '073 patent at 6:63-7:7. Error detection codes merely allow data errors to be *detected*, but do not provide for the correction of those detected errors. *Id.* Error correction codes, on the other hand, allow errors to be *corrected*. *Id.* That error detection and error correction are two different things is reinforced throughout the specification: "Error correction encoding enables some transmission errors to be corrected in a receiver, whilst using the error detection code enables any remaining uncorrected errors to be detected." '073 patent at 6:65-7:1. Figure 5 further confirms that "calculation of error detection codes" (step 504) and "error correction encoding" (step 506) are two separate steps:[2]

---

[1] In its Opening Brief, IV misstated Motorola's construction of this term, leaving out the word "errors". In order to simplify the issues, Motorola has modified the first part of its construction to track IV's.

[2] The corresponding text explains that the error detection encoder first "separates the bits in the speech parameter frame into N bit importance classes and then calculates a separate error detection code for each N classes. Any known error detection code, for example a cyclic redundancy check (CRC), may be used…The error detection bits are [subsequently] error correction encoded in error correction encoder 506, together with the speech parameter bits." '073 patent at 8:12-25.

2



Even outside of the '073 patent, one of skill in the art would know that error **detection** is not the same as error **correction**. IV has relied on the 1996 IEEE Standard Dictionary of Electrical and Electronics Terms (6th ed.) in support of its construction. Ex. A, Joint Claim Construction Statement at 4 (Dkt. No. 92-1). The pages IV cited contain definitions for error detecting coding and error correction coding, which confirm the difference between the two:

> **error-detection coding** An encoding of data and redundant check bits, such that in the presence of a data-bit or checkbit error decoding hardware can detect the error, **but cannot reconstruct the original data**.

> **error-correction coding** An encoding of data and redundant check bits that **enables decoding hardware to reconstruct the original data** in the presence of a data-bit or check-bit error.

Exhibit A, 1996 IEEE Standard Dictionary of Electrical and Electronics Terms (6th ed.) at 370 (bold in original, bold italics added). Thus even the extrinsic evidence cited by IV confirms Motorola's proposed construction of this term, which correctly recognizes this difference.

On the other hand, IV's proposed construction seeks to improperly broaden the scope of its claims by conflating these two types of codes and permitting error detection codes to also allow error correction. IV's primary argument is that the "specification flatly contradicts" Motorola's position that an error detection code cannot allow for correction of errors. But the portions of the specification IV cites have nothing to do with the *correction* of *errors*—they instead discuss *substitution* of *bad frames* (segments of audio data that have errors in them). *See*

IV Opening Br. at 16 ("bad frames are substituted").  When a bad frame is substituted, the errors in that frame are not corrected—instead the entire bad frame is replaced with a copy of an earlier frame that had no errors.  An error correction code, in contrast, allows errors within a bad frame to be corrected, so there is no need to replace that bad frame.

Finally, IV argues that Motorola's construction is inaccurate because the error detection code does not, in itself, detect errors, but instead allows errors to be detected.  IV Opening Br. at 16-17.  While Motorola disagrees with IV's characterization of Motorola's construction, to simplify the issues it has modified its construction to track IV's as follows:  "a code that *allows data errors to be detected*, but does not allow for the correction of those detected errors."  The key issue here is whether an "error detection code" can serve as an "error correction code."  It cannot.  Accordingly, the Court should adopt Motorola's construction.

### 2.  "error detection decoding means for generating an error signal"

This phrase appears in dependent claim 21.  Asserted independent claims 6 and 18 also uses the phrase "error detection decoding means . . ."; the phrases in each of these claims are indefinite for the reasons discussed below.

| Term | Motorola's Proposed Construction[3] | IV's Proposed Construction |
|---|---|---|
| error detection decoding means for generating an error signal corresponding to the respective first and second digital signal classes | Indefinite for lack of sufficient structure | <u>Function</u>: generating an error signal corresponding to respective first and second digital signal classes<br><br><u>Structure</u>: Element 604, 804 of Figures 7 and 8 respectively, and equivalents thereof |

[3] In the Joint Claim Construction Statement, Motorola requested that "any construction of this element should make it clear that there are two error signals: a first error signal corresponding to the first class and a second error signal corresponding to the second class."  To simplify the issues before the Court, Motorola has dropped that request as part of its construction, because the plain language of the claims already requires it.

The general purpose computer IV points to as performing the claimed function of the "error detection decoding means" is, as a matter of law, "insufficient to limit the scope of a claim under 112, 6." *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328 (Fed. Cir. 2008); *Voter Verified, Inc. v. Election Sys. & Software, Inc.*, 745 F. Supp. 2d 1237 (M.D. Fla. 2010).  When a general purpose computer is disclosed as the required structure under 112 ¶ 6, the specification must also disclose a "specific algorithm" or "step-by-step process" for performing the claimed function.  *Aristocrat Techs.*, 521 F.3d at 1332.  There is no algorithm for "error detection decoding" disclosed in the specification of the '073 patent.

IV does not point to any disclosure of an algorithm for "error detection decoding," and indeed does not even mention the word "algorithm" anywhere in its brief.  Instead, IV argues that the disclosures of elements 604 and 804 in Figures 7 and 8 are sufficient structure:



IV's insistence that these simple block diagrams are sufficient structure for the claimed function of "error detection decoding" is contrary to Federal Circuit law, which requires patentees "to at least disclose the algorithm that transforms the general purpose microprocessor to a 'special purpose computer programmed to perform the disclosed algorithm.'"  *Aristocrat Techs.*, 521 F.3d at 1338; *Biomedino, LLC v. Waters Technologies Corp.*, 490 F.3d 946, 83

U.S.P.Q.2d 1118 (Fed. Cir. 2007) ("If there is no structure in the specification corresponding to the means-plus-function limitation in the claims, the claim will be found invalid as indefinite").

IV criticizes Motorola for not presenting expert testimony in support of its argument that this phrase is indefinite.  But IV overstates the holding of *Elcommerce.com, Inc. v. SAP AG*, which does not preclude a Court from finding a claim indefinite without expert testimony.  IV Opening Br. at 15 (citing *Elcommerce.com, Inc. v. SAP AG*, ___ F.3d ___, 2014 WL 685622 (Fed. Cir. Feb. 24, 2014)).  In fact, the Court specifically held the opposite:  "We do not of course hold that expert testimony will always be needed for every situation. . . ."  *Elcommerce*, 2014 WL 685622 at *14.  Moreover, both this Court and the Federal Circuit have held that indefiniteness decisions such as the one Motorola asks the Court to make here are matters of law for the Court to decide.  *Default Proof Credit Card Systems, Inc. v. Home Depot U.S.A., Inc.*, 389 F. Supp. 2d 1325, 1353 (S.D. Fla. 2004), aff'd, 412 F.3d 1291 (Fed. Cir. 2005) ("A determination of invalidity for indefiniteness is, in essence, just another aspect of claim construction. Either the Court, as a matter of law, is able to construe the claims at issue, or alternatively, as matter of law, she concludes that she is unable to construe the claims because they are fatally indefinite and invalid under 35 U.S.C. § 112, ¶ 2."); *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012) ("indefiniteness is a question of law and in effect part of claim construction.").  *Elcommerce* does nothing to change this result.

IV has not pointed to any internal structure for the claimed "error detection decoding means"; boxes 604 and 804 are simply empty, black boxes.  The Court does not need expert testimony to determine that "error detection decoding means" is not properly supported, and thus indefinite and invalid.  *See Default Proof Credit Card Systems*, 389 F. Supp. 2d at 1353.

That said, in the event the Court would find expert evidence helpful on this topic, Motorola submits the declaration of Dr. Sumit Roy, attached hereto as Exhibit B.[4]  As further evidenced by the testimony of Dr. Roy, the '073 patent does not provide sufficient structure for the claimed "error detection decoding means . . . ."  Exhibit B at ¶¶ 17-20.  "Error detection decoding means . . . ." thus is indefinite and cannot be construed.

**B.    U.S. PATENT NO. 6,121,960 ("THE '960 PATENT")**

The '960 patent relates generally to a "screen peripheral system" wherein an image of a keyboard can be overlaid on top of a background image to create a composite image on a touchscreen device.  '960 patent at Abstract.  Figure 5 shows an example of such a composite image:



FIG. 5

---

[4] IV may argue that the Court should not consider Dr. Roy's testimony since Motorola did not identify Dr. Roy earlier in the claim construction process.  But if *Elcommerce* truly stands for the proposition IV says it does—i.e., that a claim cannot be indefinite without expert testimony—then *Elcommerce* is a marked shift in Federal Circuit jurisprudence.  And *Elcommerce* was not decided until ***after*** the claim construction discovery period in this case had ended.  Motorola could not have foreseen such a shift given the Federal Circuit's other case law (cited above), and thus should be allowed to submit expert testimony at this time.  Further, Motorola has offered to allow IV to depose Dr. Roy and supplement its briefing to address this evidence if necessary, including during the second round of briefing in which the parties will engage..

1.      **"pixel"**

This term appears in all of the asserted independent claims (claims 1, 19, and 26), which describe controlling pixels to display and overlay the respective images.

| Term | Motorola's Proposed Construction | IV's Proposed Construction |
|---|---|---|
| pixel | Indefinite | Plain and ordinary meaning |

IV is correct that "pixel" is a fairly common word in the field of computer science.  But IV misses the point.  Here, the issue is not the general use of the term "pixel,"[5] but rather that the *claims'* use of the term "pixel" renders them indefinite—i.e., so that one skilled in the art cannot determine whether a given product is within, or outside, the scope of the claims. *See Morton Int'l v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed. Cir. 1993); *see also Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1341 (Fed. Cir. 2003).

There are two distinct and very different types of pixels:  *physical* pixels and *logical* pixels.  A physical pixel is the "smallest image-forming unit [i.e., a tiny dot] of a display screen." 1995 Dictionary of Computer Words at 216-17 (cited in IV's Opening Br. at 2 and attached at Ex. 6).  A logical pixel is the data necessary to activate a physical pixel.  As this dictionary explains (*id.*), a logical pixel can be one bit or a set of bits that determine what is displayed at a particular physical pixel (the **pic**ture **el**ement):

> When you type a character or draw a line on-screen, the computer turns the pixels on in a specific pattern to render the image. If a pixel has only two color values (for example, black and white) it can be encoded by one bit of information. Colors or shades of gray can be displayed by increasing the number of bits used to represent each pixel. An 8-bit color monitor, for instance, uses 8 bits for each pixel, making it possible to display 256 different colors or shades of gray.

---

[5] Neither does the issue have anything to do with Motorola's use of the term "pixel" in the claims of its own patents.

The claims of the '960 patent do not distinguish between the two types of pixels, merely using the term "pixel" by itself.  As such, the term "pixel" should have a single consistent meaning. *Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998) ("A word or phrase used consistently throughout a claim should be interpreted consistently.").  But it does not.  Instead, "pixel" is used inconsistently in both the claims and specification.  In some places, the term clearly refers to physical pixels.  *E.g.*, '960 patent at claim 1 ("touch-activated input device compris[es] a plurality of ***pixels*** …") (emphasis added).  In other places, the term appears to refer to logical pixels.  *E.g.*, claim 1 ("wherein the variable-pixel control includes ***logical operators*** . . . such that individual ***pixels*** . . . can be dedicated simultaneously . . . .") (emphasis added).  *Physical* pixels are fixed (albeit very small) structures in the screen, and cannot be combined, with logical operators or otherwise.  Thus, it is unclear which type of pixel these claims cover, and the '960 patent fails to provide the requisite notice to the public of its scope. *All Dental Prodx, LLC v. Advantage Dental Prods.*, 309 F.3d 774, 779–80 (Fed. Cir. 2002) ("The primary purpose of the definiteness requirement is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, *e.g.*, competitors of the patent owner, can determine whether or not they infringe.").

IV's infringement contentions suffer from the same flaw, as IV vacillates between accusing physical and logical pixels.  For some claim elements, IV clearly points to physical pixels.  *E.g.*, Ex. C to IV Infringement Contentions at 3 ("The Motorola Moto X AMOLED touch-activated display comprises a plurality of pixels; particularly, it displays 720 x 1280 pixels, with approximately 312 ppi pixel density.").  Yet for other claim elements, IV points to

logical pixels.  *E.g.*, *id.* at 50 ("OpenGL ES functionality provides an efficient method of performing ***logical combination of up to three sets of pixels***.") (emphasis added).

IV again cites *Elcommerce* and argues Motorola's argument must fail because it did not present expert testimony.  But here, the intrinsic evidence is clear, and there is also extrinsic evidence in front of the Court, in the form of technical dictionaries cited by IV itself.  The Court does not need expert testimony to determine that this claim element is not properly supported, and thus indefinite and invalid.  *See Default Proof Credit Card Systems*, 389 F. Supp. 2d at 1353.

In short, neither IV nor the '960 patent itself provides sufficient delineation between physical and logical pixels, an irreconcilable ambiguity exacerbated by IV's infringement theories in this case.  Here, the term "pixel" is indefinite in the claims of the '960 patent.  The Federal Circuit has found claims indefinite and invalid under similar circumstances.  *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1369 (Fed. Cir. 2013) ("We agree with Appellants that Group I claims are indefinite . . . .  It is undisputed that Group I claims contain an ambiguity because their plain language does not indicate which average molecular weight measure [out of several options] is intended.").

C.    <u>U.S. PATENT NO. 7,382,771 ("THE '771 PATENT")</u>

The '771 patent relates generally to providing Internet access using a mobile wireless access point (also called a "mobile hotspot").  '771 patent at Abstract.  Figure 2 of the '771 patent shows such a system, with a Mobile Hotspot (labeled 40) in a Mobile Vehicle providing wireless Internet access to client devices (labeled 30) that are also within that mobile vehicle:



Figure 2

### 1.    "without the need to access an external service controller server"

This phrase appears in the only asserted independent claim (claim 1).

| Term | Motorola's Proposed Construction | IV's Proposed Construction |
|---|---|---|
| without the need to access an external service controller server | Without the need to connect to an external server before enabling client device internet access | Without the need to access a service controller server external to the mobile hotspot and wireless network |

IV correctly identifies that the "issue here is what constitutes an 'external service controller server.'" IV Opening Br. at 17. This phrase is not a term of art, nor does it appear anywhere in the specification of the '771 patent—it was added during prosecution to distinguish over a specific piece of prior art.

Specifically, the applicant added the phrase "without the need to access an external service controller server" to distinguish the alleged invention from the Kokkinen prior art.[6] '771 File History, November 30, 2007 Response to Office Action, at 2:

> Applicant has a ***LAN router 16 that connects the wireless access point 12 to the Internet Access Interface 42*** which in Figs. 1 to 4 is a long-range wireless Internet Interface or WAN. ***There is no service controller or auxiliary server required as in Kokkinen.*** Applicant's system is, thus, capable of standalone operation unlike the system of Kokkinen. Claim 1 claims stand-alone operation as well as ***not having a requirement for an external server***.

*Id.* at 9 (emphasis added). By making these statements, the applicant made it abundantly clear that "without the need to access an external service controller server" means the system does not access an external or auxiliary server in order to access the Internet. Motorola's proposed construction flows directly from the applicant's explanation of that claim phrase and provides a clear definition for the "external service controller server." *SkinMedica, Inc. v. Histogen, Inc.*, 727 F.3d 1187, 1195 (Fed. Cir. 2013) ("When construing claim terms, we first look to, and primarily rely on, the intrinsic evidence, including the prosecution history and the specification — which is usually dispositive.").

Motorola's proposed construction is further confirmed by the other requirement the applicants added to the claims to distinguish the Kokkinen prior art—i.e., that the "mobile wireless hotspot system is a ***stand-alone system***." '771 File History, November 30, 2007 Response to Office Action, at 2 (emphasis added). A "stand-alone system" does not connect to any external or auxiliary server in order to access the Internet. *See* '771 patent at Figure 2 (above on page 10).

IV does not appear to dispute Motorola's construction, acknowledging that "the '771 patent . . . provides Internet access *without the need* to access an external server or external

---

[6] The applicant added the phrase "stand-alone system" in the same amendment, for the same purpose.

components. . . ."  IV Opening Br. at 20 (emphasis in original).  However, IV's own construction

provides no guidance as to "what constitutes an 'external service controller server.'"  Rather, IV

just repeats the claim language and attempts to define "external" as "external to the mobile

hotspot and wireless network."  For the reasons above, the claim language should be construed

as Motorola proposes.

And while Motorola agrees that the "external service controller server" must be external

to the mobile hotspot, IV's proposed requirement that the "external service controller server"

must also be external to the "wireless network" is unsupported by the evidence.  The "external

service controller server" is not mentioned in the '771 patent's claims or specification at all, and

the applicants defined it during prosecution solely with reference to the presence of such a server

in the Kokkinen prior art.  However, in Kokkinen, the "external service controller server" ***was***

connected over a wireless network to the mobile hotspot.  This is reflected in Figure 2 of

Kokkinen below, where the "external service controller server" (labeled 90) is connected to the

mobile hotspot server (labeled 50) over the very same wireless connection that connects the

hotspot to the Internet:



*Figure 2*

13

Therefore, by requiring that the "external service controller server" be "external to the wireless network," IV's proposed construction would mean that the "external service controller server" (item 90) in the Kokkinen prior art would not, in fact, be an "external service controller server" as that term is used in the '771 patent's claims. In other words, this term would not cover the very prior art that the '771 patent applicants sought to distinguish. IV's construction thus would render irrelevant the prior art distinguished during prosecution and cannot be correct.

Further, comparing the figure above from Kokkinen to Figure 2 from the '771 patent highlights the correctness of Motorola's proposed construction. As shown in Figure 2 (above on page 11), the claimed mobile hotspot (element 40) connects directly to the internet without the need to access any type of external or auxiliary server. Thus, Motorola's proposed construction should be adopted.

### 2.    "local content module"

This phrase appears in asserted dependent claim 4.

| Term | Motorola's Proposed Construction | IV's Proposed Construction |
|---|---|---|
| local content module | A module capable of customizing local content to present to a client device based on location and/or client demographics | Module on the mobile wireless hotspot that can present content stored locally to a user |

The dispute is whether the word "local" in this claim element refers to content of local interest to the user (as Motorola proposes), or instead can refer to content stored locally on the user's device (as IV proposes). The phrase "local content module" is not a term of art, and the Court must look to the specification to determine its meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-1321 (Fed. Cir. 2005) (en banc). Motorola's proposed construction is derived directly from the only disclosure of the "local content module" in the specification:

14

> ***The Local Content Module (LCM) 52 customizes the information presented to the user*** from the local web server module 54. The LCM 52 gathers position information from the onboard GPS module 68, if present, in order to tailor advertising, news and traffic information ***based on the location*** of the vehicle. The LCM 52 also analyzes web surfing patterns from the Web Cache module 54 in order to tailor advertising ***based on the interests of the customers*** using the service.

'771 patent at 4:24-32 (emphasis added).  Motorola's construction captures the patentee's very own definition, which controls.  *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009) ("When a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls.").

IV's construction, on the other hand, completely ignores the patent's definition and neither mentions nor cites the specification's explicit discussion of "local content module." Instead, IV takes the unsupported position that a "local content module" merely refers to a module that stores any type of content "locally."  Such a position cannot stand, as the patentee's explicit definition controls.  *See Martek Biosciences*, 579 F.3d at 1381.

Moreover, IV's proposed construction includes reference to a "user," a word that does not appear in any of the claims.  The addition of "user" only introduces ambiguity, as it is unclear what "user" IV is referring to—is it a user of the Internet, a user of the mobile hotspot, or a user of a client device that is connected to the Internet through the mobile hotspot?  The claim explicitly recites a "local content module that stores content ***that can be accessed by said client devices***."  '771 at claim 4 (emphasis added).  Thus, client devices, not some abstract "user" of the system, access the content stored in the local content module.  The parties agree that construing this term requires noting who (or what) is presented the content from the local content module:  Motorola's construction uses the phrase "client device," which already appears in the claim; IV's construction needlessly injects the ambiguous term "user" into the claims.

IV also argues that Motorola's construction is incorrect because it allegedly "conflicts with the language of claim 5," which discusses using a GPS locator "to enable dynamic tailoring of local content." IV Opening Br. at 22. However, what claim 5 does or does not say is irrelevant; claim 4 refers to the local content module, and claim 5 does not. Moreover, both claim 4 and claim 5 depend directly from claim 1—they can overlap in claim scope. *See Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006) ("On the other hand, claim drafters can use different terms to define the exact same subject matter. Indeed this court has acknowledged that two claims with different terminology can define the exact same subject matter."). There is no conflict in claim scope between Motorola's construction and claim 5—under Motorola's construction, use of location information (i.e., information from a GPS) is *optional*. Thus, IV's claim differentiation argument fails.

**D.    U.S. PATENT NO. 7,848,353 ("THE '353 PATENT")**

The '353 patent relates to a communication system wherein a single signal is used both to indicate the "operating bandwidth" and to convey information over that "operating bandwidth."

**1.      "bandwidth"**

This phrase appears in both asserted independent claims (claims 1 and 21).

| Term | Motorola's Proposed Construction | IV's Proposed Construction |
|------|----------------------------------|----------------------------|
| bandwidth | Indefinite | The width of a frequency band |

IV is correct that "bandwidth" is a fairly common word in the field of telecommunications. But as with "pixel," IV misses the point. The issue here is whether the '353 patent's *use* of the term "bandwidth" renders the claims indefinite.[7] *See Morton Int'l*, 5

---

[7] This issue has nothing to do with Motorola's use of the term "bandwidth" in the claims of its own patents.

16

F.3d at 1470.  The term "bandwidth" has multiple definitions.  Indeed, even IV's own extrinsic evidence provides two distinct definitions for "bandwidth":

> 1) a ***range within a band of wavelengths, frequencies, or energies***; especially :  a range of radio frequencies which is occupied by a modulated carrier wave, which is assigned to a service, or over which a device can operate
>
> 2) the capacity for data transfer of an electronic communications system <graphics consume more bandwidth than text does>; especially :  the maximum ***data transfer rate*** of such a system <a bandwidth of 56 kilobits per second>

http://www.merriam-webster.com/dictionary/bandwidth (last visited Mar. 18, 2014) (cited by IV in Ex. A of the Joint Claim Construction Statement at 3) (emphasis added).  The technical dictionaries IV cites in its Opening Brief provide similar distinct definitions.  Focal Illustrated Dictionary of Telecommunications (1999) ("bandwidth: The bandwidth of a device is usually a measure of the *frequency range* or *frequency band* over which it meets its operating characteristics.  Therefore the bandwidth of a *transmission medium* in the band of frequencies which it can carry without significant loss or *distortion*.") (italics in original) (Ex. 9 to IV Opening Br.); Newton's Telecom Dictionary 9th Ed. (1995) ("Bandwidth: 1. A range of electrical frequencies a device can handle….") (Ex. 10 to IV Opening Br.).[8]

The problem here is that it is unclear *which* definition of bandwidth should apply when interpreting the claims of the '353 Patent.  The patent never equates "bandwidth" with "the width of a frequency band" as IV suggests.  Instead, the specification provides directly opposing guidance as to what "bandwidth" means.  In some instances, the specification uses "bandwidth" interchangeably with "data rate."  '353 patent at 4:39-45 ("[I]t is within the contemplation of the invention that the inventive concepts described herein can be applied to any multi-***bandwidth***/multi-***data rate*** communication system. . . .") (emphasis added).

---

[8] Tellingly, IV does not rely on any of the many definitions in the various dictionaries it cites, but rather creates its own proposed construction.

In other places, the specification uses "bandwidth" interchangeably with "chip rate."[9] Specifically, the specification uses the symbol "f"—typically used in the art to represent a frequency—to refer to both bandwidths and chip rates. *E.g.*, Compare '353 patent at 7:3-4 ("the chip-rate being used for the SCH is $f_b$") with '353 patent at 7:11-12 ("the receiver bandwidth is set to $f_b$").  Here, the patent equates bandwidth with both chip rate ***and*** frequency.

Yet in still other places, the specification implies that bandwidth and chip rate are distinct concepts.  For example, the specification states that the receiver "will by default, select the receiver bandwidth ***appropriate to*** this lower chip-rate" so that the receiver can "recover the SCH irrespective of the chip rate used" at the transmitter.  '353 patent at 6:1-5; *see also id.*, 7:65-8:4.

In short, while bandwidth is a common term, it has several meanings.  The '353 patent is itself unclear as to which meaning of "bandwidth" should apply for the purposes of claim construction, and IV has further muddied the waters by introducing dictionary definitions (which it does not use) as well as its own definition of that term (which is unsupported by the specification).  All of these conflicting definitions of "bandwidth" prevent one of skill in the art from understanding the scope of the claims. *See Teva Pharmaceuticals*, 723 F.3d at 1369; *Morton Int'l*, 5 F.3d at 1470.

IV's overly broad citation to *Elcommerce* fails for the same reasons given above.  There is both intrinsic and extrinsic evidence in front of the Court that shows conflicting definitions of "bandwidth."  This term is indefinite in the context of the '353 patent.

---

[9] The chip rate for any given communication is not the same as the data rate, but the two are proportionally related.  The higher the chip rate, the higher the data rate can be. *See generally* Exhibit C, Prasad, Ramjee and Tero Ojanpera, An Overview of CDMA Evolution Toward Wideband CDMA, IEEE Communications Surveys, Vol. 1, No. 1, at 5 (1998).

2.      **"signal portion" terms**

These related phrases appear in both asserted independent claims (claims 1 and 21).

| Term | Motorola's Proposed Construction | IV's Proposed Construction |
|---|---|---|
| a signal having a first signal portion | A contiguous (self-contained) signal that includes a first portion and a second portion; the first portion precedes (is processed first) and is at a lower bandwidth than the second portion | A signal transmitted from a base station to the remote unit having a first portion |
| a further signal portion | The second portion of the contiguous (self-contained) signal, the second portion follows and is at a higher bandwidth than the first portion | A second portion of the signal transmitted from a base station to the remote unit |

As IV recognized in its Opening Brief, these two terms are interrelated and can be addressed together.  There are two issues here:  (1) whether the "first signal portion" and the "further signal portion" are in the same, contiguous signal; and (2) whether the "first signal portion" precedes and is at a lower bandwidth than the "further signal portion."

  a. <u>The "First Signal Portion" and the "Further Signal Portion" are in the Same, Contiguous Signal</u>

First, the plain language of the claims requires that the "first signal ***portion***" and the "further signal ***portion***" are both ***portions*** of the **same**, contiguous signal.  *See* http://www.merriam-webster.com/dictionary/portion ("a part of a larger amount, area, etc.") (last visited Mar. 18, 2014).  Further, several dependent claims refer back to ***the signal***, which confirms that the claims recite one, single signal made up of a "first signal portion" and a "further signal portion."  *E.g.*, '353 at claim 5 ("The method of claim 1, wherein ***the signal*** comprises . . . .") (emphasis added).

Second, the specification describes the "first signal portion" and "further signal portion" with reference to Figure 4A:



The "first signal portion" is labeled "SCH" and with the number 320.  The "further signal portion" is labeled "Data Burst Construct" and with the number 330.  Those two portions are combined into a single, contiguous signal in the step labeled 310.  '353 patent at 7:26-31 ("a combiner 310 combines SCH information 320 (filtered by a digital low-pass filter 325 set to the low chip rate $f_b$ so as to ensure that the SCH information can be recovered in the receiver by filtering at this chip rate) with the appropriate data burst construct 330.").  The result of the combination is a data burst, which is passed to the antenna for transmission.  *Id.* at 7:34-40 ("The resultant data burst . . . is passed to the antenna for transmission.").

IV's argument that the signal (made up of the "first signal portion" and "further signal portion") cannot be contiguous because the system is "bursty" or on different channels is a red herring—as shown above in Figure 4A, the two portions are combined into the same, contiguous data burst.  In other words, the two terms are not inconsistent.  Indeed, whether communications are "bursty" has no bearing on whether they are contiguous.  As is well known in the art, "***burst mode***" is "a ***mode of transmission*** by which a system can send a burst of data at higher speed for

20

some period of time."  Exhibit A, 1996 IEEE Standard Dictionary of Electrical and Electronics

Terms (6th ed.) at 117 (emphasis added).  IV's assertion that "bursty" communications cannot

use a contiguous signal is thus incorrect.  Similarly, IV's reliance on claim differentiation to

support this argument also lacks merit.  Claim 5, which depends from claim 1 and adds the

limitation that "the signal comprises a data burst" is in no way in conflict with Motorola's

construction, as the contiguous signal of claim 1 may or may not be transmitted in a data burst.

*Seachange Int'l, Inc. v. C-COR Inc,* 413 F.3d 1361, 1368-1369 (Fed. Cir. 2005).

> b.   The "First Signal Portion" Precedes and is at a Lower Bandwidth than the
> "Further Signal Portion."

Further, the claim language and specification are clear that the "first signal portion" must

precede—i.e., be processed before—the "further signal portion."  For example, claim 1 states

that the system first "***recover[s] the indication*** from the first signal portion at the first,

predetermined bandwidth; and recover[s] information in the further signal portion ***at the***

***operating bandwidth indicated by the indication***."  *Id.* at claim 1.  As can be seen from the

claim language, the system cannot recover the information in the "further signal portion at the

operating bandwidth indicated by the indication" unless it has already "recovered the indication

from the first signal portion."  The "first signal portion" thus necessarily precedes the "further

signal portion."  The claims' use of the words "first" and "further" provide additional

confirmation of this fact.  *See*, http://www.merriam-webster.com/dictionary/first ("coming before

all others in time, order, or importance"); http://www.merriam-webster.com/dictionary/further

("to or at a more distant place or time") (last visited Mar. 18, 2014).

The specification confirms that when the claimed signal is received, the "first signal

portion" contains information that the system must process before it can process the data in the

"further signal portion."  *E.g.*, '353 patent at 7:56-64 ("In this multi chip-rate case, the system

chip rate information decoded from the SCH information indicates the higher chip rate used for transport channel information.  Since this indicated system chip rate $f_c$ is higher than the low chip rate $f_b$ used for the SCH information, the receive path is then configured into a second state, as shown in FIG. 4C, in which the analogue section 360 and the digital low pass receive filter 370 are set to bandwidths appropriate for the higher chip rate $f_c$.").  In short, the SCH information ("first signal portion") causes configuration of a second state to receive the "further signal portion" of the signal, which *cannot be processed until the first signal portion is processed*.  *Id.*

Finally, the specification is explicit that the "first signal portion"—the SCH data shown in Figure 4—"is *always transmitted at the lower chip rate*."  '353 patent at 5:66-67.  Thus, the "first signal portion" must be at a lower bandwidth (chip-rate) than the "further signal portion." IV's claim differentiation argument is inapposite.  Claim differentiation is merely a presumption that can be rebutted by the written description or prosecution history.  *Regents of the Uni. of California v. DakoCytomation California, Inc*., 517 F.3d 1364, 1375 (Fed. Cir. 2008) (citing *Seachange*, 413 F.3d at 1369).  Here, the specification explicitly requires that the "first signal portion" be at a lower bandwidth.  Claim differentiation cannot compel a different result.  *See Netcraf Corp. v. eBay, Inc.*, 549 F.3d 1394, 1398 (Fed. Cir. 2008).

### 3.  "recovering the indication"

| Term | Motorola's Proposed Construction | IV's Proposed Construction |
|---|---|---|
| recovering the indication | This term is not enabled by the specification | Recovering a value corresponding to the operating bandwidth at which the remote unit will be configured to communicate with a base station |

In order to simplify the issues before the Court at this time, and based on IV's position that Motorola's argument is premature, Motorola is willing to defer its argument that this phrase is not enabled until after the claim construction phase of the case.  Motorola suggests that this

term be given its presumed plain and ordinary meaning.  *Thorner v. Sony Entertainment America, LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("The words of a claim are generally given their ordinary and customary meaning. . . .").

IV's proposed construction is unnecessary.  The phrase "recovering the indication" refers back to "an indication of an operating bandwidth" mentioned earlier in the claim.  *E.g.*, '353 patent at claim 1.  IV's construction essentially substitutes the word "value" for "indication," and improperly attempts to limit the scope of the claims by adding in a restriction that is not present in the claims—that the "operating bandwidth" is the bandwidth "at which the remote unit will be configured to communicate with a base station."  The claims do not contain this limitation, or even mention a "base station."  Thus, IV's construction should be rejected.

## E.   U.S. PATENT NO. 5,790,793 ("THE '793 PATENT")

The '793 patent relates to a "method and system for sending and receiving Uniform Resource Locators (URLs) in electronic mail over the Internet."  '793 patent at Abstract.  URLs are links used to refer to information located on the Internet, and they can be included within messages sent from one computer to another.  '793 patent at 27-41. The '793 patent relates to techniques for creating, transmitting, receiving, and viewing messages containing such URLs.

### 1.    "reference to a predetermined location"

This phrase appears in asserted independent claims 1, 10, 21, and 30.  Asserted independent claim 39 uses the phrase "address to a predetermined location" in the exact same manner as the other claims used "reference to a predetermined location"; that phrase should be construed to have the same meaning.

| Term | Motorola's Proposed Construction (modified)[10] | IV's Proposed Construction |
|---|---|---|
| reference to a predetermined location | a pointer to another, predetermined location or address on the Internet | Reference to a particular location that is predetermined |

The dispute is whether the "predetermined location" must be a location other than the computer that created or sent the message containing a reference (such as a URL), as Motorola proposes, or may be any location, as IV proposes.  IV's proposed construction merely rearranges the words of the claim.  But, as both parties appear to agree, this phrase needs some meaning, particularly in the context of the claims.  *O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed.") (internal citations omitted).  Motorola's proposed construction provides that meaning.

As IV explains in its Opening Brief, the claim phrase "reference to a predetermined location" arises from how the alleged "invention allows ***messages to be sent and received with Uniform Resource Locators ("URL"), also known generally as a link***. . . ."  IV Opening Br. at 22 (emphasis added).  Thus, the claimed "reference to a predetermined location" is essentially a particular type of URL or link.[11]  Figure 6 shows an example of a message containing a URL "reference to a predetermined location":

---

[10] Motorola has modified its construction of this claim term to simplify the issues before the Court.

[11] Certain dependent claims specifically require that the "reference to a predetermined location" be a "Uniform Resource Locator (URL)."  *E.g.*, claim 4.  Thus the claimed "reference to a predetermined location" need not be in the specific format of a URL, and instead can be any URL-type link.

*FIG. 6*

Motorola's proposed construction comes directly from the specification, which explains that a "'URL' type . . . *means* that the message is essentially *a pointer to another location or address on the Internet*." *Id.* at 5:28-30 (emphasis added). When the patentee provides an explicit definition of a term, that explicit definition controls. *Martek Biosciences*, 579 F.3d at 1381.

Rather than address the substance of Motorola's original construction, IV characterizes it as "oddly worded and difficult to parse." IV Opening Br. at 23. Motorola does not agree with IV, but to narrow the disputes has modified its proposed construction to address this issue, as shown above. Motorola's modified construction is taken directly from the specification, whose definition should control here.

F. **CONCLUSION**

For the reasons stated above, Motorola respectfully requests that the Court adopt its proposed constructions.

DATED:   March 21, 2014

Respectfully submitted,

**ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.**

*s/Edward M. Mullins*
Edward M. Mullins (Fla. Bar No. 863920)
emullins@astidavis.com
Regan N. Kruse (Fla. Bar No. 84404)
rkruse@astidavis.com
1001 Brickell Bay Drive, Ninth Floor
Miami, Florida 33131
Tel:  (305) 372-8282
Fax:  (305) 372-8202

**KILPATRICK TOWNSEND & STOCKTON LLP**

Christopher Schenck (*pro hac vice*)
cschenck@kilpatricktownsend.com
1420 Fifth Avenue, Suite 4400
Seattle, WA 98101
Tel:  (206) 467-9600
Fax:  (206) 623-6793

Steven D. Moore (*pro hac vice*)
smoore@kilpatricktownsend.com
Two Embarcadero Center, Eighth Floor
San Francisco, CA 94111
Tel:  (415) 273-4741
Fax:  (415) 576-0300

Theodore G. Brown, III (*pro hac vice*)
tbrown@kilpatricktownsend.com
1080 Marsh Road
Menlo Park, CA 94025
Tel:  (650) 324-635
Fax:  (650) 326-2422

Mitchell G. Stockwell (*pro hac vice*)
mstockwell@kilpatricktownsend.com
William H. Boice (*pro hac vice*)
bboice@kilpatricktownsend.com
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
Tel:  (404) 8l5-6214

Fax:  (404) 815-6555

Taylor Ludlam (*pro hac vice*)
taludlam@kilpatricktownsend.com
4208 Six Forks Road, Suite 1400
Raleigh, NC 27609
Tel:  (919) 420-1705
Fax:  (919) 420-1800

***Attorneys for Defendant
Motorola Mobility LLC***

27

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 21, 2014, I electronically filed the foregoing

document with the Clerk of the Court using the CM/ECF filing system.  I also certify that the

foregoing document is being served this date on all counsel of record or pro se parties on the

Service List below in the manner specified, either via transmission of Notices of Electronic

Filing generated by the CM/ECF system or; in some other authorized manner for those counsel

or parties who are not authorized to receive electronically Notices of Electronic Filing.

DATED:   March 21, 2014

By: *s/Edward M. Mullins*_____
Edward M. Mullins (Fla. Bar No. 863920)

## SERVICE LIST

*Intellectual Ventures I LLC, et al. v. Motorola Mobility LLC*
Case No.: 13-cv-61358-RSR
United States District Court, Southern District of Florida

**HARKE CLASBY & BUSHMAN LLP**

Howard Mitchell Bushman
hbushman@harkeclasy.com
Sarah Clasby Engel
sengel@harkeclasby.com
Lance August Harke
lharke@harkeclasby.com
9699 Northeast Second Avenue
Miami Shores, FL 33138
Tel: (305) 536-8220
Fax: (305) 536-8229

*Counsel for Plaintiffs*
*Intellectual Ventures I LLC and*
*Intellectual Ventures II LLC*
Electronically served via CM/ECF

**FEINBERG DAY ALBERTI &
THOMPSON, LLP**

M. Elizabeth Day
eday@feinday.com
Marc C. Belloli
mbelloli@feinday.com
1600 El Camino Real
Suite 280
Menlo Park, CA 94025
Tel: (650) 618-4360
Fax: (650) 618-4368

*Counsel for Plaintiffs*
*Intellectual Ventures I LLC and*
*Intellectual Ventures II LLC*
Electronically served via CM/ECF